Good morning everyone. The first case for oral argument this morning is David Munchinski v. Gerald Solomon et al. I can't help but mention that Mr. Munchinski's offenses that occurred in late 1977, at which point I myself was in the first months of service as an assistant district attorney, and obviously in another county in Pennsylvania, and I'm now age 66. So that by way of background is introduction for Mr. Pellis to come forward at this time. Thank you, Your Honor. Good morning. My name is Tom Pellis. I'm here on behalf of Gerald Solomon and Ralph Worman, the prosecutors at the time. I ask to please reserve three minutes for rebuttal. Granted. Thank you. Could we, because as with so many cases of this age and complexity that results from the various layers of process, which is to say collateral attack following conviction, perhaps order discussion of this case by talking about absolute immunity and application, well-known of it, to specific discovery material and origin? Or orders of court and qualified immunity as applicable, well-known with respect to the same? Of course, Your Honor. I'll do my best. Judge, just by way of a quick summary, which I think is relevant to your decision in this case, this case is very complicated because of its history of proceedings, as the court has already noticed, and its age. The events which took place in this case, which are part of this 1983 action, occurred in the 1980s. And it's important to keep in mind that in the 1980s, technology was nowhere near what we have today. From computers to fax machines to the storage and sharing of information, we weren't there in the 1980s when these events took place. If you want to find out what took place in the 1980s, you have to go to the Fayette County Prothonotary's office, solicit the help of the kind people that work there, go down into the basement of the Fayette County Courthouse, and spend hours and hours reviewing Fox's documents. Mr. Spellis, you're using some of your valuable time on some history which is undoubtedly correct, and history which I'm sorry to say I personally witnessed and experienced many years ago, but I think we ought to cut to the chase. Thank you, Your Honor. Your Honor, the trial judge made numerous errors on the application of absolute immunity. The court denied absolute immunity based upon four factors. One, in 1982, Bowen interview was investigatory. Two, the prosecutors violated two court orders requiring them to produce documents. Three, the prosecutor Warman altered Trooper Goodwin's September 9, 1982, police report by removing a reference to a recording of Bowen's interview. And four, the court's finding that Brady violations were actually established and that Paczynski was entitled to summary judgment. Can we start with the investigatory nature of the Bowen interview? Yes, Your Honor. How long was it that that interview occurred after Goodwin first learned about Paczynski as a possible suspect? We took Trooper Goodwin's deposition in this case, and he testified consistent with his prior testimony. He met Bowen at the Monaco Police Department. Yeah, we've got a first meeting that Goodwin has himself, right, with Bowen. That meeting, Goodwin takes Bowen. Bowen tells him, I will testify if I get immunity. Just stay with me, if you would. Okay. We have a meeting between a state police officer and Bowen. And then Goodwin, the state police officer, takes Bowen to the district attorney's office. That's meeting number two, if you will. Correct. And then, subsequently, there is a third meeting at the district attorney's office. Correct, Your Honor. That's the factual sequence. Yes. And I'm interested in the time lapse among those three meetings. Your Honor, I don't have the exact dates. I think there was approximately a month and a half between meeting two and meeting three as they took place. But the meeting two at the district attorney's office was clearly a meeting to discuss witness immunity. Bowen told Goodwin, I will provide this information regarding the murders if I'm granted immunity. Goodwin testified in this case and has consistently throughout that he took Bowen to meeting two to meet with the prosecutors to determine whether or not they would grant him immunity for his testimony. Now, the granting of immunity is clearly a prosecutorial action. All right. And how much lapse of time between meeting one and meeting two? I believe that meeting one and meeting two took place the same day or within the same period of hours. Right. So how could they possibly not be in investigatory mode in meeting two? They can't possibly at this point have wrapped up their investigation, could they? The issue at hand when Goodwin took him to the district attorney's office was whether or not he would be granted immunity. Judge Hardiman's question answers itself, doesn't it? That if what the meeting is about is securing a witness by means of affording immunity to that witness, the investigation is ongoing, right? It is not an investigative act. There are no charges have been filed against him. But are we talking about the grant of immunity here or are we talking about the meeting and what took place in the meeting? Has anybody attacked the grant of immunity? Is that an issue? The grant of immunity has not been attacked. The function of granting immunity, however, is a prosecutorial function. How much time lapse between these meetings and charging? The next day, wasn't it? We discussed immunity on October 21 of 1982. It was charged in October. And Majinski and Scaglione are arrested and charged on October 22. Isn't that correct? Yes, Your Honor. Your Honor, the only evidence produced in this case is that the subject of that meeting was regarding immunity. That is the evidence which exists. There is no other evidence. Well, wasn't there a finding of fact by one of the many courts to have entertained this case? There was a finding of fact that it was at least partially investigatory, wasn't there? Your Honor, if there was such a finding of fact, it would have been through the habeas proceedings. The Superior Court of Pennsylvania, and that's an excellent point, basically addressed all of these issues. They addressed all the Brady violations involved in this case, and they found in favor of the prosecutors. It wasn't until this case got to 20 years later that the narrative changed. The narrative changed 20 years later at PCRA 3, which was overturned by the Superior Court. And then that narrative from PCRA 3, which was reversed by the Superior Court of Pennsylvania, was used in the habeas proceedings in the federal court. Now, the habeas proceedings, of course, are using a much more expansive review, and they're not bound by rege to the cutter or collateral estoppel. They did rely on PCRA 3, which was reversed, and that became the 20-year-later narrative of a faxing case. All right, but that sounds like a criticism of what the federal district court did on habeas, right? I mean, there's nothing. That die has been cast, hasn't it? It's not really a criticism of that, Your Honor. I think it's a criticism of you have different people involved. You have the attorney general's office involved. The prosecutors are not involved in these habeas proceedings. Let's get back to the meeting. I'm still trying to figure out what the significance of the meeting is, as opposed to the significance of a grant of immunity, the latter of which is not subject to attack here, is not under attack here. So what? Aren't your clients facing liability for allowing a recording of the statement taken to be lost? No, Your Honor. You mean destroyed? Your Honor, that's an excellent point also, and the facts of this case are that the superior court has already decided, following Judge Frank's PCRA 1, that no recording was made. There never was a recording of this meeting. So you're right, it is a so-what meeting. It is a so-what meeting, and the trial judge engaged in some improper fact-finding to reach his conclusions. But the superior court has already affirmed, PCRA 1, Judge Frank's, who took seven days of testimony, and they found that there was no recording. Now, the witnesses, some of them are dead. But what happened on that day, the woman who ran the tape recorder in the prosecutor's office had to go home at 4 o'clock. So the district court here then, according to your position, is in error in its suggestion that there remains a question of fact to be resolved by the jury regarding the existence of a tape. No, Your Honor. My position is that the district court erred certainly by engaging in fact-finding, but before that, the district court erred by ignoring the clear facts of the case as they exist and as they have been established by the precedent by the superior court and by PCRA 1, which is the law of this case. So please then correct me since you recharacterized what I thought was the situation. So the district court has not left open the question of whether or not a tape existed, whether you think that was correct or not. Has the court left that question open? I believe the district court has improperly left that question open. Thank you. Yes, sir. I'm sorry I misunderstood the question. So do we have jurisdiction over that issue if it's a factual issue? Judge, I believe that you do have jurisdiction on the issue of absolute immunity, regardless of whether it's a factual issue. But if they're open facts, facts that haven't been resolved, shouldn't that really be a jury issue? No, Your Honor. I don't believe that it should be in this case. I believe this court can look at the record of evidence. On an interlocutory appeal that goes to immunity, we are required to deal with the set of facts that has been set out by the district court, right? We can't question those facts. Yes or no? I would say that you are bound by the facts with regards to immunity from the district court. Accordingly, anything having to do with the grant of summary judgment here is not before us in this case, right? That's correct, Your Honor. What's before this case is the application of absolute and qualified immunity. Let's talk about the modification, if you will, of the Goodwin report. What's your position on that? Your Honor, the Goodwin report was modified by Judge Warman, and he testified, and he's consistently testified, that he removed a paragraph of the report that referenced the statement being taken at the first Bowen interview. He was later confirmed to be right by PCRA 1, which, after fact-finding, found that no statement took place. But all that Judge Warman did was remove that incorrect portion of Goodwin's report. All that he did? Yes, Your Honor. He did not destroy evidence. He redacted something that was inaccurate in that report. And how did it come to light, and when, that the report had, in fact, been redacted? It was an issue that was addressed thoroughly at PCRA 1 before Judge Franks. So prior to trial, all the way back to the early 80s, the defense was not aware that what it had was a redacted report referring to a tape, right? That's correct, Your Honor, a tape which never existed. Well, you know, aside from the metaphysics involved in that question, there were, of course, alternatives to what Mr. Warman did, which would have been an interlineation, initial, dated. A supplemental report probably would have been the best course to take. So what legitimate prosecutorial function is served by what I would refer to as tampering with the Goodwin report? Your Honor, it's a function in discovery and producing documents. He was acting in his capacity as a prosecutor, as a lawyer, in producing documents in discovery in the case. Modifying evidence is consistent with the prosecutorial function? It was producing documents, Your Honor. So you've agreed that the document was modified, redacted, whatever you want to call it. Yes, he said he redacted that. So that's consistent with the prosecutorial function? Whether we like it or not, Your Honor, this court has said in coercion, that it rejected a theory that bad motives defeat absolute immunity. Because time is limited, let's go on to Judge Schekete's order. Now, as I understand it, you contend that Schekete's order was meant to cover only physical evidence? Am I correctly reading that? That's correct, Your Honor. Well, where did you get that out of the language of the October 31, 1983 order? Which, as I read it, says all of the evidence. You're correct, Your Honor. The order itself is very broad. However, we went to the basement of the Fayette County, and we got a copy of the motion itself. And the motion specifically said it referred to physical evidence. Well, motions are nice things, and they're necessary things, but they're not decretal. And they don't establish law or legal obligations. This says all of the evidence. So doesn't that, by its terms, remove any degree of discretion from the prosecutors in what they are to hand over? Your Honor, we believe that it dealt with physical evidence. Mr. Machinsky wanted to appear and review the evidence himself with his counsel. He did that at both the district attorney's office and at the state police barracks. There is no evidence that that order was not complied with. There is no evidence at all in this case that the prosecutors did not turn over or show everything they had, including the physical evidence, at that 1983 order. It is mere speculation that that occurred. It's admitted in this case, and Mr. Machinsky himself admits it, that it's not until PCRA 3, when the subpoena is given to Harrisburg, that the Pennsylvania State Police produce additional reports. But there's no evidence the prosecutors ever had back in the 1980s. Let's jump forward then to Judge Frank's order. Mr. Warman argues he had no personal involvement in complying with that order. Is that right? Mr. Warman was not involved in the order of court with PCRA 1. ADA COPUS testified in this case that he was in charge of PCRA 1. COPUS was responsible for producing the documents. He said that he did produce all the documents in the possession of the foul. But Warman did later argue, didn't he, that he did have some involvement. Did he argue at the motion-to-dismiss stage that he was personally involved in briefing the PCRA 1? And he testified in that case also, Your Honor. And that he took part in hearings? On a limited basis, Your Honor. He was not lead counsel. He was the district attorney at the time, and he was a witness. And COPUS was in charge of the document production. Could we consider Mr. Warman to have been a custodian of evidence at that time? I don't believe so, Your Honor. I believe that the responsibility for complying with that court order rests with ADA COPUS, who said he complied with it. You would agree, as a matter of law, that if, in fact, he was acting, even as a mere custodian, he would not be entitled to absolute immunity. If he was acting as a custodian of the documents and nothing else within his prosecutorial function, I would say that would be correct, Your Honor. We've gone over time, but obviously it is an important case for both sides, and we will have you back on rebuttal, Mr. Collins. Thank you, Your Honor. Thank you. Good morning. May it please the Court, Noah Geary on behalf of Appley, David Machinsky, who is sitting at counsel table. Mr. Geary, good morning. I am asking you to affirm Judge Chacon's ruling. There is no genuine issue of material fact here on any issue. What's left here, just to remind me, assuming we did affirm on the immunity issues that are before us, what is left to take place before Judge Chacon? A jury at which time, jury trial at which time, the burden will be on Mr. Machinsky and I to prove causation, i.e., that the exculpatory evidence that was withheld by Warman and Solomon would have affected the outcome of Mr. Machinsky's trial. I believe Mr. Pellis' position is that this question of the recorded statement has already been resolved as a matter of fact previously in the PCRA proceedings. What's your response to that? That is incorrect. Judge Franks ruled in February 12th, 1993, his order that he cannot compel the production of a tape that he has been assured never existed. Judge Franks never ruled that a tape-recorded statement was not taken. He only referenced that it's been assured by Warman and Solomon that it never existed. Then there was additional fact-finding taken by Judge Feudel because there was after-discovered evidence in PCRA 3, specifically a videotaped deposition interview of Richard Bowen by Defendant Fayok, where Fayok himself refers to the statement being tape-recorded on September 9th, 1982. There were also two waiver forms that were produced and discovered for the first time in 2001 during PCRA 3 that relate to the tape-recorded statement. So additional fact-finding was undergone, and Judge Feudel found that, yes, a tape-recorded statement was taken, was made, and that also was withheld from Mr. Machinsky. Now, Judge Chacon ruled that the issue of whether or not the statement was tape-recorded will be an issue of fact for the jury at a trial. All right. Let's look at Judge Schichetti's order. Now, I think the case law is clear. This is the language from Yaris. It's well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence so long as they did so while functioning in their prosecutorial capacity. Doesn't that authority afford absolute immunity to the prosecutors here, even though what they may have done was incomplete or, in the views of others, even wrong? No, sir, because of the authority of Hodd v. Malone, which specifically stated that we are loathe to grant absolute immunity to prosecutors who disobey court orders. Of course, there is no advocacy involved in complying with a court order. There is advocacy in arguing a motion to compel, but once a court issues a court order, and this is referenced in Wrights v. County of Bucks as well, which is cited in Hodd, a prosecutor has an obligation to duly comply with a court order, and secondly to Sure, but is that a constitutional obligation? Nobody cited Schneider. Schneider followed Hodd v. Malone. And in Schneider v. Smith, which I think was at the summary judgment stage of Hodd v. Malone, we said that 1983 liability does not attach to the violation of a judge's order. In other words, Malone's language has to be read in the context of the subsequent Schneider opinion. If I may have one quick moment, Your Honor, please. The Schneider case, is that? My point to you is that if the obligation on the part of the prosecutors here is to comply with the Constitution for purposes of 1983, the mere violation of a state court order does not necessarily give rise, by itself, to a violation of 1983, does it? That's not a constitutional violation. It may be subject to contempt, but it's not necessarily a constitutional violation. Well, I think the issue is whether or not it affords them the absolute immunity, and there's no discretion involved in complying with a court order, and the premise for absolute Well, of course, there's no discretion involved in complying with any court order to the extent that that order is clear, and one can't raise questions about vagueness in it. But, again, we're not talking about whether the conduct which is violative of an order is lawful or unlawful. We're talking about whether the conduct violates some provision of constitutional law. It's not a matter that is subject to 1983 liability every time a state officer is in violation of a state judge's order. That's my point. Well, prosecutors, just like any other party, any other litigant, they have to obey court orders. I'm not sure you're apprehending the Chief's question. Let me see if I can help out. I apologize. If the court order says counsel are hereby ordered to appear for trial tomorrow morning at 8.45 a.m. and the lawyer shows up at 9.15, the lawyer has violated the court order, right? Yes, sir. Do you have a 1983 case for that violation? No, sir. Thank you. And here's one additional factor with respect to that. And I don't have the text of Judge Caccietti's order right in front of me, but I have read it several times. And, interestingly, it came down in the wake of the promulgation of Pennsylvania's very first pretrial discovery rule. I remember that very well in the very late 1970s. And while the order does not specifically recite the discovery rule, it's pretty clear that, by its language, that it's based on the state discovery rule, which, again, unless there's some other basis in constitutional law, the mere violation of a state judge's discovery order under state criminal procedure would also not give rise to 1983 liability. Would you agree? Yes, except the violation by the prosecutors is of a constitutional right to a fair trial. So that is the constitutional right that was violated by the disobeyance and repeated flagrant violations of the court orders, in this case, by Judge Caccietti and Judge Franks. Mr. Munchensky had a constitutional right to a fair trial, and that is where the constitutional right comes in and the constitutional violation comes in. As to absolute immunity, Judge Chacon correctly ruled Warman and Solomon not entitled to absolute immunity under odd because it states there are certain categories of conduct by prosecutors by virtue of their egregiousness are not going to be protected by absolute immunity. Well, it didn't have to do with the fact that it was a ministerial act. You know, in odd, the judge orders the prosecutor to advise if things change so that Mr. Odd could be released, right? Correct. So there was nothing, there was no discretion involved. It was a ministerial act. Correct, but there's no discretion involved or permitted in complying with a court order that says, you shall turn over to Mr. Munchensky and his counsel all evidence. A to Z. So that's the nub of the dispute is you're saying turn over all the evidence means all the evidence, not what the motion said. The motion is impertinent. Impertinent, Judge Cecchetti's order was crystal clear, unambiguous, and it was all the evidence. And Judge Frank's order was very clear as well. And Judge Warman, by the way, filed a pleading December 22, 1992. He was personally involved in that PCRA proceeding. It wasn't just COPAs. Warman filed a response to Judge Frank's October 19th. He was personally involved in advocating at that stage, right? So that doesn't help you, does it? That personal involvement was as an advocate on behalf of the commonwealth. He was personally involved also, though, as this court pointed out, as a mere custodian of records, which is administrative function, not an advocative function, which is also not entitled to absolute immunity. If I may address the – Is there any record evidence of involvement by Warman, personal involvement by Warman, in the production of evidence in response to Judge Frank's order? I think the summary judgment discovery record, Warman was involved as a custodian with another trooper, Humphrey Lukachuk, because COPAs was an underling of Prosecutor Warman and COPAs had to go to Warman, so Warman was involved personally as a custodian of the evidence. The discovery record will bear that out. Okay. And so if Warman was a custodian of evidence, then he would not be entitled to absolute immunity. Correct. And he would also not be entitled to qualified immunity because in 1992 and 1993, Mr. Munchinsky had a clearly established constitutional right to exculpatory evidence, which was in the actual possession of the prosecutors, and it was in the actual possession of the prosecutors. The appellants here – well, I'll just – What do you say in response to their argument that, no, it wasn't in their possession, it was with the state police? Montgomery Goodwin, the prosecuting trooper, testified numerous times through the tortured history of this case that he took the entire state police files to Warman and Solomon. He gave them the entire file, and it was called the station copy because it was kept in the state police barracks. And if that – was that found as a matter of fact anywhere? It was found as a matter of fact by Judge Feudal, and it was found as a matter of fact by Judge Lenahan on the habeas, and I believe by the Third Circuit on affirmance of Judge Lenahan. I wrote the latter opinion, and I don't usually make findings of fact, but I understand your point. Well, with respect to the possession, well known, by the prosecutors of this Brady material, at what point in time does the law become established that there would be an obligation on the part of the prosecutors to, as a legal fiction, no, but in any event, as a legal obligation, be required to hand over to the defense a Brady material or discoverable material that is in the hands of the police, but not in the hands of the prosecutors. At what point does that obligation arise? If I may, Your Honor, that is a – I'll answer it in a moment, but that is a red herring. No, it's not. Okay. No, it's not. Trooper – my position is it's a red herring because Trooper Goodwin testified before the 1983 trial, hung jury, 1983. He took the entire file. Gary, you are here to answer the court's questions as well as to advocate your position. Now, I've asked you a very straightforward question of law, which is answerable under both Supreme Court jurisprudence and our own, specifically Perdomo. Now, if you have an answer, fine, if you don't. It's Kyles v. Whitley, Your Honor, 1995. Right. The reason why that is a red herring is because all the exculpatory evidence here at issue was in the actual possession of the prosecutors. Effective what date? Prior to the 1983 trial, I don't remember the date from the record, but Montgomery took – Goodwin testified. He's the prosecuting trooper, state police. He takes the entire file, which even included the three files from Bowen, where Bowen was in Oklahoma on a robbery, not even in the state of Pennsylvania. Goodwin gave those entire files to Warman and Solomon. That's 12 years before Kyles? Yes, sir. So Goodwin's testimony establishes the exculpatory evidence at issue was in the actual possession of the prosecutors. Therefore, to my mind, any discussion of, well, did the prosecutors know it was in the possession of the police? They knew it was in their own possession, and they knew about it. That's just the rationale behind my red herring argument. Anything else? No. Let me just ask another question. Sure. At the motion to dismiss stage, the district court held that when Kopis withheld evidence, he was acting as a prosecutor, and I'm going to quote the district court here, by protecting the finality of a criminal conviction. You remember that? Yes, sir. Why shouldn't the same be true as to Warman? Didn't they engage in the same conduct? That was an interlocutory order, and I fully intend to appeal that. Judge, Mr. Kopis, he … Mr. Kopis is not a party to this case, right? Well, he was originally. I understand. He's no longer a party to this case. Correct. But at the end of this case, that was an interlocutory order there, Rule 12. I fully intend to appeal that, because that flies in the face of Odd v. Malone, which states we are not going, this court is not going, to give absolute immunity to prosecutors who disobey court orders. Okay. So, as I understand your answer, then, unless you can get that reversed on appeal, Warman would be entitled to the same treatment as Kopis, and that's why you want it reversed. Yes, I think that was error by Judge Sircone at the Rule 12 stage as to Mr. Kopis. Sorry. Thank you very much. Thank you. Mr. Pellis, you have rebuttal. Thank you. Your Honors, first on the issue of Judge Frank's order in PCRA 1 and the discussion that just took place. At the outset, Judge Franks did not, admittedly, maintain a record of the documents that were produced in PCRA 1. There is no evidence that every document was not produced in PCRA 1.  In fact, Judge Franks pointedly testified at one point in a later PCRA that had he had all the evidence, he might have ruled differently. Yes, Your Honor, that was in PCRA, the reverse of PCRA 3. Correct. And that involved two police reports that were presented to him. But I wanted to point out that there was no record. We don't know what was produced. It's mere speculation as to what was or was not produced or whether or not it was material or that it would have changed the outcome of Manchinski's trial. On the issue of Odd v. Malone, I do not believe that this Court made such a sweeping statement in Odd v. Malone that it is going to create Section 1983 violation for any prosecutor's violation of a court order. Odd v. Malone was completely distinguishable, and Your Honors know that the case involved witnesses who were incarcerated. It wasn't someone who was actually being prosecuted at the time. What do you make of counsel's argument that in 1983, as effective 1983 or thereabouts, well before Kyle's, the prosecutors had the entire file? Your Honor, the evidence in the case is that the entire state police file was produced before PCRA 3, before Judge Fudale's proceedings sometime in 2000. That's what the evidence is in the case. Well, they say Goodwin testified otherwise. What's your response? Goodwin has testified a number of times, but at no time did Goodwin testify that I went and gathered every state policeman who did an investigation into this case and that I got their file and that I put it all together and that I gave it to the prosecutors. And it is important to note, as the Court pointed out, that at the time that these events took place, prosecutors were not responsible for producing or they were not responsible for obtaining what was contained in the police files. But if the files were given, delivered, hand-delivered to the prosecutors, the responsibility attaches at that moment, right? I would say, Your Honor, yes, if they had the files. And I understand Mr. Geary to be suggesting that there was a finding of fact in that regard. Yes or no? No, Your Honor, I don't believe that there's a finding of fact that the entire state police file was ever produced until PCRA 3. That's pretty critical here, right? Yes, Your Honor. All right. We thank both of counsel for their contributions today to argument in this lengthy saga, which we hope in the courts of the United States will soon be brought to an end one way or another. It's certainly not a tribute to the justice system that a matter has, in various stages, gone on this long. We thank counsel again, and the matter is concluded for today. Thank you, Your Honor. We'll take the case under advisement.